GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California
ANGELA M. HANSEN
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:    (510) 637-3500
Facsimile:    (510) 637-3507
Email:        Angela_Hansen@fd.org

Counsel for Defendant HARTMAN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 20–126 VC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| RICHARD HARTMAN, | **Court:** Courtroom 4, 17th Floor |
| Defendant. | **Hearing Date:** May 18, 2021 |
| | **Hearing Time:** 3:00 p.m. |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

THE ADVISORY GUIDELINES ................................................................................... 3

ARGUMENT .................................................................................................................. 5

I.     THE COURT SHOULD VARY FROM THE ADVISORY RANGE BASED ON
POLICY CONSIDERATIONS ..................................................................... 5

II.    THE COURT SHOULD VARY FROM THE ADVISORY RANGE AND IMPOSE A
ONE-YEAR-AND-ONE-DAY SENTENCE BASED ON SEVERAL OTHER
RELEVANT SENTENCING FACTORS ....................................................... 11

A.    Mr. Hartman's History and Characteristics ......................................... 12

B.    The Nature and Circumstances of the Offense .................................... 20

C.    The Need to Reflect the Seriousness of the Offense, to Promote Respect for the
Law and to Provide Just Punishment ................................................... 23

D.    The Need to Avoid Unwanted Sentencing Disparities ........................ 26

CONCLUSION .............................................................................................................. 29

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                **Page(s)**

*Kimbrough v. United States*,
  552 U.S. 85 (2007) ............................................................................................ 5, 12

*Nelson v. United States*,
  555 U.S. 350 (2009) ............................................................................................. 11

*United States v. Abraham*,
  No. 12CR384, 2013 WL 2099795 (D. Neb. May 15, 2013) ........................... 26

*United States v. Apodaca*,
  641 F.3d 1077 (9th Cir. 2011) ......................................................................... 23, 27

*United States v. Autery*,
  555 F.3d 864 (9th Cir. 2009) .............................................................................. 27

*United States v. Booker*,
  543 U.S. 220 (2005) .............................................................................................. 11

*United States v. Boyden*,
  No. 06-CR-20243, 2007 WL 1725402 (E.D. Mich. June 14, 2007) ............... 27

*United States v. Burns*,
  No. 07 CR 556, 2009 WL 3617448 (N.D. Ill. Oct. 27, 2009) ............................ 9

*United States v. Claiborne*,
  439 F.3d 479 (8th Cir. 2006) .............................................................................. 11

*United States v. Collins*,
  684 F.3d 873 (9th Cir. 2012) .............................................................................. 23

*United States v. Crespo-Rios*,
  No. 08-CR-208, 2015 WL 6394256 (D.P.R. Oct. 19, 2015) ........................... 27

*United States v. Cruikshank*,
  667 F. Supp. 2d 697 (S.D.W. Va. 2009) .............................................................. 10

*United States v. D.M.*,
  No. 12-CR-170, 2013 WL 1846543 (E.D.N.Y. May 1, 2013) ......................... 27

*United States v. Diaz*,
  720 F. Supp. 2d 1039 (E.D. Wis. 2010) ........................................................... 9, 27

*United States v. Grober*,
  624 F.3d 592 (3d Cir. 2010) ............................................................................... 26

*United States v. Hanson*,
  561 F. Supp. 2d 1004 (E.D. Wis. 2008) ............................................................. 10

*United States v. Henderson*,
  649 F.3d 955 (9th Cir. 2011) ................................................. 5, 8, 10, 29

*United States v. Mallatt*,
  No. 13-CR-3005, 2013 WL 6196946 (D. Neb. Nov. 27, 2013) ................... 27

*United States v. Meillier*,
  650 F. Supp. 2d 887 (D. Minn. 2009) ........................................ 27

*United States v. Polito*,
  215 F. App'x 354 (5th Cir. 2007) ........................................... 27

*United States v. Prisel*,
  316 F. App'x 377 (6th Cir. 2008) ........................................... 27

*United States v. R.V.*,
  157 F. Supp. 3d 207 (E.D.N.Y. 2016) ................................... *passim*

*United States v. Rowan*,
  530 F.3d 379 (5th Cir. 2008) ............................................... 27

*United States v. Stall*,
  581 F.3d 276 (6th Cir. 2009) ............................................... 27

**Federal Statutes and Guidelines**

18 U.S.C. § 3553 .............................................................. 8, 11, 12

U.S.S.G. § 2G2.2 ..............................................................*passim*

U.S.S.G. § 2B3.1 .................................................................. 11

U.S.S.G. § 2A2.1 .................................................................. 11

**Other Authority**

Michael Keller and Gabriel Dance, *Child Abusers Run Rampant as Tech Companies Look the Other Way*, NEW YORK TIMES (Nov. 9, 2019) ...................................... 1, 25

Ravi Somaiya, *Nudes are Old News at Playboy*, NEW YORK TIMES (Oct. 12, 2015) ............ 3

*Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (Jan. 1, 2009) ........................................ 10

*Report to Congress: Federal Child Pornography Offenses*, UNITED STATES SENTENCING COMMISSION, at 312-13 (Dec. 2012) ...................................................... 10

*Results of Survey of United States District Judges January 2010 Through March 2010*, UNITED STATES SENTENCING COMMISSION ...................................................... 7

*2020 Sourcebook of Federal Sentencing Statistics*, UNITED STATES SENTENCING COMMISSION ....... 8, 26

*Use of Guidelines and Specific Offense Characteristics (Offender Based)*, UNITED STATES SENTENCING COMMISSION (Apr. 2020) ................................................ 4, 8

1

2

**INTRODUCTION**

3

This is a story about a law-abiding, good and decent man who fell into deep bouts of depression

4

that led him down a rabbit hole of addiction.  Depression manifests itself in different ways in different

5

people.  For Richard Hartman, his depression was always just below the surface, and when it broke

6

through, it weighed on him heavily.  He found himself in a downward spiral, ignoring work, hygiene,

7

friendships and connections.  Withdrawing from the world, he closed the curtains and stayed up all

8

night, consuming internet content.  He spent countless hours playing online games, engaging in

9

political discourse and viewing pornography.

10

11

Being at home without a job or a relationship exacerbates many internet addictions, as we have

12

seen during this global pandemic.  And the internet is full of dark and sick content.  We see it in

13

absurd conspiracy theories and in hate-filled sites encouraging violence.  Sadly, part of the sick nature

14

of online content includes photographs and videos of the horrific sexual abuse of children.[1]

15

There is no easy explanation for what leads a good person to engage in this conduct.  But many

16

of those who become addicted initially to internet pornography eventually drift to child pornography.

17

Some of these people, consumed with viewing pornography, fall into viewing on-line sexual displays

18

involving minors; others are true pedophiles intent on preying on real children.  The appropriate

19

sentence in a given case depends on where on this spectrum a defendant may fall.  *See United States*

20

*v. R.V.*, 157 F. Supp. 3d 207, 210-11 (E.D.N.Y. 2016) (describing the varying degrees of culpability

21

of child pornography offenders, Senior Judge Jack B. Weinstein excoriated the lengthy sentences

22

23

24

[1]No one disputes the horrific nature of the images recovered in this case.  Mr. Hartman's acceptance

25

letter to the Court, Exh. A, acknowledges the serious human cost of child pornography, and he knows
he has no one but himself to blame for his conduct.  Nevertheless, these materials are readily

26

available to even law-abiding citizens who would not otherwise seek out these images.  Internet and
technology companies have the ability to block much of this content, stopping the repeated

27

victimization of these children.  For various reasons they have chosen not to act and have escaped
sanctions for allowing this content on their platforms.  Michael Keller and Gabriel Dance, *Child

28

Abusers Run Rampant as Tech Companies Look the Other Way*, NEW YORK TIMES (Nov. 9, 2019)
(available at https://www.nytimes.com/interactive /2019/11/09/us/internet-child-sex-abuse.html).

DEFENDANT'S SENTENCING MEMORANDUM
*HARTMAN*, CR 20–126 VC

prescribed by the Guidelines for certain child pornography offenders). Mr. Hartman falls within the lowest category. Like the defendant in *R.V.,* Mr. Hartman was a low-end possessor of illegal images. He did not produce child pornography, and he did not have any inappropriate contact or communication with any minor. He did not communicate about children with other people by phone, text message or over the internet, in chat rooms, on web sites or by email.

Moreover, Mr. Hartman's background, history and success on pretrial release confirm that he is in this lowest category. Mr. Hartman has been out of custody for 14 months and has performed perfectly on release. He is working hard to understand his behavior in this case and to understand the roots of his depression, an illness that, when coupled with testosterone replacement therapy, led him to compulsively view pornography and other internet content. He has been attending intensive counseling and therapy sessions for more than a year to process his conduct in this case. Most importantly, he has been evaluated by a forensic psychologist who concluded that he is not a pedophile and that he poses the lowest likelihood of recidivism. As a result, Mr. Hartman requires treatment, counseling and community supervision to address the offense conduct, not a half-decade in federal custody.

The PSR recommends a variance from 78 months to 60 months. Although Mr. Hartman appreciates the recognition that a within-Guidelines sentence is not appropriate, a greater variance is necessary here to achieve the goals of sentencing. The PSR's recommendation relies in large part on an undifferentiated adherence to the applicable advisory sentencing Guidelines range. Mr. Hartman submits, and a substantial number of courts in this district and elsewhere have concluded, that the Guidelines ranges for child pornography offenses – and, notably, several enhancements that apply here – are not entitled to significant deference because they were not developed through the Sentencing Commission's statutorily mandated evidence- and expert-based process.

A punishment is of course required, but Mr. Hartman urges the Court to consider his background and history, the psychological report, sentences of similarly situated defendants and the other factors identified below to impose a sentence of one year and one day, followed by five years of supervised release. Given the other collateral consequences of this conviction, including lifetime sex-offender registration, this sentence is more than sufficient to satisfy the goals of sentencing.

## THE ADVISORY GUIDELINES

As with any sentence in federal court, we must start with the Federal Sentencing Guidelines. The applicable Guideline in this case is § 2G2.2. Mr. Hartman starts at an offense level 18. This base offense level is then substantially increased by a number of sentencing enhancements. First, the offense level is increased by two because the images Mr. Hartman received were located on a computer. *See* § 2G2.2 (b)(6) ("if the offense involved the use of a computer or an interactive computer service . . . increase by 2 levels"). With the proliferation of online access to child pornography, this enhancement has been rendered meaningless.[2] Print adult pornography is a dying art form. Even Playboy magazine stopped publishing nude photographs this year because pornography is so readily available on the Internet. *See* Ravi Somaiya, *Nudes are Old News at Playboy*, NEW YORK TIMES (Oct. 12, 2015).[3] Indeed, most adults who view and/or download legal pornography over the Internet do so with a computer, tablet or similar device, and this applies to the illegal consumption of child pornography as well. *Id*. ("Pornography magazines, even those as storied as Playboy, have lost their shock value, their commercial value, and their cultural

---

[2]As discussed in the argument section below, courts have granted variances to discount for this two-level enhancement.

[3]Available at https://www.nytimes.com/2015/10/13/business/media/nudes-are-old-news-at-playboy.html.

relevance."); *see also R.V.*, 157 F. Supp. 3d 207, at 232-36 (explaining how the "Internet revolution enabled child pornography consumption").

The offense level also is increased by five levels because Mr. Hartman possessed more than 600 images. *See* § 2G2.2(b)(7)(D). In addition, Mr. Hartman receives a two-level enhancement for possessing images that contained pre-pubescent minors (§ 2G2.2(b)(2)), and a four-level increase for possessing images that contained sadistic material (§ 2G2.2(b)(4)). PSR ¶ 21. These three enhancements are typical in internet-based child pornography cases because massive quantities of graphic images involving very young victims are, sadly, widely circulated on the internet. *R.V.*, 157 F. Supp. 3d at 232. Indeed, as set forth in the argument section below, these upward adjustments apply to almost every child-pornography defendant. Specific offense characteristics applied in 99.7% of the cases sentenced under § 2G2.2 in fiscal year 2020. *See Use of Guidelines and Specific Offense Characteristics (Offender Based),* UNITED STATES SENTENCING COMMISSION (Apr. 2020).[4] This concentration of nearly all offenders at the higher end of the sentencing spectrum, based on factors that are innate to the offense of conviction, should be factored into the Court's sentencing determination.

After applying thirteen levels for these four specific offense characteristics, the resulting offense level is 31, which is reduced by three levels for acceptance of responsibility for a final adjusted offense level of 28. At offense level 28, Criminal History Category I, the resulting advisory Guidelines range is 78 to 97 months. For the reasons set forth in the argument section below, Mr. Hartman submits that the range prescribed by the advisory Guidelines yields an unreasonable and unduly high sentence.

---

[4]Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Offender_Based.pdf.

DEFENDANT'S SENTENCING MEMORANDUM
*HARTMAN*, CR 20–126 VC

4

**ARGUMENT**

**I.    THE COURT SHOULD VARY FROM THE ADVISORY RANGE BASED ON POLICY CONSIDERATIONS**

**A.  The Court Should Vary from the Advisory Range Because the Child Pornography Guideline Is Excessive And Not Based On Empirical Evidence**

Ordinarily the Guidelines are entitled to deference because they are the product of years of careful study.  But when a particular guideline is not the result of careful study or empirical analysis, such deference is unfounded.  *See Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007).  In *Kimbrough*, a case involving the sentencing disparity between crack cocaine and powder cocaine offenses, the Supreme Court held that district courts have discretion to vary from a correctly calculated Guidelines range "based solely on policy considerations, including disagreements with the Guidelines." *Id*. at 101.  In particular, the Court recognized that when guidelines are not the result of "empirical data and national experience, guided by a professional staff with appropriate expertise," they do not "exemplify the Commission's exercise of its characteristic institutional role." *Id*. at 109. In such cases, sentencing courts may conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Id*. at 110.

The Ninth Circuit has reached the same conclusion regarding the child pornography Guidelines.  *United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011).  *Henderson* not only recognizes that "district courts may vary from child pornography guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case," *id*. at 963, but it also holds that a district court "commits procedural error when it fails to appreciate its *Kimbrough* discretion to vary from the child pornography Guidelines based on a categorical disagreement with them." *Id.* at 964.

The Guidelines for child pornography offenses have increased dramatically over the years, and in nearly every instance, Congress mandated these increases, often over the objection of the

Sentencing Commission.  *Id.* at 960-62.  When possession of child pornography was criminalized in 1990, the Sentencing Commission created a new guideline for that offense, with a base offense level of ten and a two-level enhancement for material involving a prepubescent minor.  *Id.* (citations omitted).  Congress was not satisfied, however, and in 1991, "over the objection of the Commission," it directed the Commission to increase the penalties.  *Id.* at 960.  Among other changes, Congress "explicitly ordered the Commission" to increase the base offense levels to fifteen (for receipt, transportation, and trafficking) and thirteen (for possession).  *Id.* at 960-61.

Congress demanded further increases in 1995, raising the base offense level by two levels and adding a two-level enhancement for use of a computer.  *Id.*  When the Sentencing Commission submitted a report to Congress that was critical of the congressionally mandated two-level computer enhancement because "it failed to distinguish serious commercial distributors from more run-of-the-mill users," Congress "responded with legislation that directed the Commission to add enhancements for the use of a computer to persuade, induce, entice, coerce or facilitate the transport of a child; to increase penalties in any case in which the defendant engaged in a pattern of activity; and to clarify that distribution included distribution for nonpecuniary gain."  *Id.* at 961 (citations omitted).

With the enactment of the 2003 PROTECT Act, "Congress – for the first time and the only time to date – made direct amendments to the Guidelines."  *Id.* (citation omitted).  These amendments included an enhancement for images of sadistic or masochistic conduct and a range of enhancements based upon the number of images.  *Id.*  In sum, the child pornography guidelines have been substantively revised nine times during their twenty-three years of existence.  Most of the revisions were Congressionally mandated and not the result of an empirical study.  As the Sentencing Commission itself has explained, "[t]he frequent mandatory minimum legislation and specific directives to the Commission to amend the [G]uidelines make it difficult to gauge the effectiveness of

any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Id*. (citation omitted).

The escalating Guideline ranges in child pornography cases have caused "widespread dissatisfaction" among district court judges. *United States v. Apodaca*, 641 F.3d 1077, 1083 (9th Cir. 2011) (citing *Results of Survey of United States District Judges January 2010 Through March 2010*, UNITED STATES SENTENCING COMMISSION). For example, 71% of the federal judges surveyed in 2010 believed that the mandatory minimum sentence for receipt of child pornography was too high, and 69% believed that the guidelines for receipt offenses were too high. *Id*. The judiciary's discomfort with the child pornography guidelines is reflected in the sentences imposed throughout the country.

For example, in 2006 approximately 26% of all federal defendants sentenced under § 2G2.2 received a sentence below the advisory range. Ten years later, in 2016, almost 70% of all defendants received a sentence below the range.[5] Even the government has recognized the harshness of the



_____

[5]The above chart depicts the trend with regard to sentencing in child pornography cases over a decade (2006-2016). It was compiled from annual data provided by the United States Sentencing Commission from tables appended to its *Sourcebook of Federal Sentencing Statistics*, available at https://www.ussc.gov/research/sourcebook/archive. It references § 2G2.2 data each year for "Sentences Relative to the Guideline Range by Each Primary Sentencing Guideline" (*e.g.*, Table 28 in 2016). The green line represents cases where the government had sponsored the decrease. The

sentences produced by this guideline.  The number of government-sponsored downward variances *not* based on a defendant providing substantial assistance to authorities doubled between 2010 and 2016.

This trend continues today.  A sentence imposed within the range calculated under § 2G2.2 is the exception, not the norm.  Nationwide, in 2020, out of 1020 cases, only 313 were within the range.  Eleven were above-Guideline sentences, and 696 defendants – nearly 69% – received a variance or a downward departure.  *2020 Sourcebook of Federal Sentencing Statistics*, UNITED STATES SENTENCING COMMISSION, Table 32 ("Sentence Imposed Relative to the Guideline Range by Primary Sentencing Guideline").[6]  In all, almost 70% of child pornography sentences were lower than the range in 2020; only about 30% were within or above the range.

Section 2G2.2's overly harsh sentencing ranges also run afoul of the statutory requirement that the court impose a sentence based on the individual characteristics of the offender.  18 U.S.C. § 3553(a).  As Judge Berzon notes, "an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders being sentenced to near the statutory maximum term," a result which "stands in significant tension with a sentencing judge's duties 'to consider every convicted person as an individual.'"  *Henderson*, 649 F.3d at 965 (Berzon, J., concurring) (citation omitted).

Indeed, as noted above, specific offense characteristics applied in nearly 100% of the cases sentenced under § 2G2.2 in fiscal year 2020.  *Use of Guidelines and Specific Offense Characteristics*, UNITED STATES SENTENCING COMMISSION, at 42-43 (2020).  According to the Sentencing Commission's fiscal year 2020 figures, the percentage of child pornography defendants who received the same enhancements applicable to Mr. Hartman are as follows:

---

blue line represents non-government-sponsored sentences.  The yellow line represents the combined total of all types of sentences that were below the guideline range.

[6] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

§ 2G2.2(b)(2)  Victim under the age of 12 years (two levels): 94.6% of defendants

§ 2G2.2(b)(4)  Sadistic/masochistic or other violence (four levels): 83.2% of defendants

§ 2G2.2(b)(6)  Use of a computer (two levels): 94.4% of defendants

§ 2G2.2(b)(7)  Number of images (two-to-five levels): 94% of defendants

*Id.*

Because these enhancements apply in virtually every case, there is little room for this Court to distinguish between more and less culpable offenders.  For example, the "use of a computer" enhancement applies in nearly every pornography case and is therefore meaningless as a measure of relative culpability.  *See, e.g.*, *United States v. Carrie Myles*, 16-CR-409 HSG (N.D. Cal. 2017) (granting variance because "use of a computer" enhancement applies in every case and is not a useful indicator of criminal activity); *see also R.V.*, 157 F. Supp. 3d at 232–36 (explaining how computers and the internet have enabled "child pornography consumption").  The enhancements also raise troubling issues regarding intent and knowledge.  As one district court observes, the "nature of file-sharing software is such that offenders often have little control over or awareness of the number of images being downloaded."  *United States v. Burns*, 2009 WL 3617448, at *7 (N.D. Ill. Oct. 27, 2009) (unpublished); *see also United States v. Diaz*, 720 F. Supp. 2d 1039, 1042 (E.D. Wis. 2010) (explaining that the enhancements for the number of images is a questionable measure of culpability because, "as a result of internet swapping, offenders readily obtain the necessary number of images with minimal effort.").[7]

Similarly, defendants often acquire images that trigger enhancements – for example, images of prepubescent minors or images depicting sadistic or masochistic conduct – without intending to acquire that type of image or even realizing that they have done so.  *See id.*; *see also R.V.*, 157 F.

---

[7]As many as 73.6% of defendants receive the five-level enhancement under subsection (b)(7)(D) for having more than 600 images. *Use of Guidelines and Specific Offense Characteristics* at 42-43.

Supp. 3d at 232 ("technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims . . . as a result of such changes, entry-level offenders now easily can acquire and distribute large quantities of child pornography . . . .") (citing *Report to Congress: Federal Child Pornography Offenses*, UNITED STATES SENTENCING COMMISSION, at 312-13 (Dec. 2012)); *United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wis. 2008) ("given the unfortunate ease of access to this type of material in the computer age, compiling a collection with hundreds of images is all too easy," yet it carries an enhancement that "nearly doubles the range"; the other large enhancement" "for portrayal of sadistic conduct – applies whether or not the person specifically intended to possess such material . . . which seems an odd way of measuring culpability."). Critically, due to the near-automatic application of many of these enhancements, § 2G2.2 makes it difficult to "differentiate between those who create child pornography and those who consume it." *United States v. Cruikshank*, 667 F. Supp. 2d 697, 701-02 (S.D. W.Va. 2009).

The effect on Mr. Hartman's guidelines range of the Sentencing Commission's amendments and enhancements to the child pornography Guidelines is both excessive and unwarranted.  By calling for a near-decade-long sentence for every first-time offender who uses a computer and possesses a number of videos, the Guidelines leave no room for more serious sentences for offenders who are more culpable or dangerous.  In a concurrence in *Henderson*, Judge Berzon wrote separately "to emphasize that unjust and sometimes bizarre results will follow if § 2G2.2 is applied by the district courts without a special awareness of the Guideline's anomalous history."  649 F.3d at 964-65 (Berzon, J., concurring) (citing Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (Jan. 1, 2009)).  Section 2G2.2 often recommends "longer sentences for those who receive or distribute images of minors than the

applicable Guidelines recommend for those who actually engage in sexual conduct with minors."[8]

*Id.* at 965 (citation omitted).

In summary, the Guidelines usually are considered a cornerstone of reasonableness, but only because it is assumed that each section was "the product of years of careful study." *United States v. Claiborne*, 439 F.3d 479, 481 (8th Cir. 2006). Where, as here, it has been established that the applicable Guidelines were not a product of careful study or empirical analysis, any presumption that they are reasonable is especially unfounded. Accordingly, the range articulated under § 2G2.2 should be afforded significantly less weight by this Court than in the ordinary case.

For all of these reasons, Mr. Hartman requests that the Court vary downward to discount for the use of the computer (two levels), sadistic conduct (four levels) and number of images (five levels), enhancements that, as applied here, overstate the offense conduct.

## II. THE COURT SHOULD VARY FROM THE ADVISORY RANGE AND IMPOSE A ONE-YEAR-AND-ONE-DAY SENTENCE BASED ON SEVERAL OTHER RELEVANT SENTENCING FACTORS

The Court is familiar with the directives of *United States v. Booker*, 543 U.S. 220 (2005), and 18 U.S.C. § 3553(a). The Sentencing Guidelines range is not mandatory, and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence. Importantly, the Court may not presume the Guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam). Instead, the Court must also consider the nature and circumstances of the offense and

---

[8]The sentences produced by other Guidelines that address very serious, violent conduct further highlight the excessive ranges produced by § 2G2.2: had Mr. Hartman robbed a bank and brandished a gun to threaten bank employees, and committed a carjacking to effectuate his getaway, he would face an offense level 26. *See* § 2B3.1. Had he assaulted someone with the intent to commit a second degree murder and caused his victim a life-threatening injury, his offense level would be 28, which is the same for the instant case where he did not physically touch or attempt to physically harm any person. *See* § 2A2.1.

the history and characteristics of the defendant, as well as the need to avoid unwarranted sentence

disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6).

Section § 3553(a) "contains an overarching provision" directing the district court to

impose a sentence that is "sufficient, but not greater than necessary, to comply with" the

purposes of sentencing.  *Kimbrough*, 552 U.S. at 101.  In crafting a sentence that is "sufficient, but

not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court

also must consider the need for the sentence imposed:  (A) to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate

deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.  18

U.S.C. § 3553(a)(2).  In short, this Court has the authority and responsibility in this case to impose a

sentence, without undue regard for the advisory Guideline range, that is no greater than necessary in

light of all the facts before it.  Mr. Hartman submits that the sentencing factors addressed below

weigh in favor of a significantly below-Guidelines sentence.

## A.    Mr. Hartman's History and Characteristics

Mr. Hartman is educated as a lawyer and was first in his class in law school.  He left his job as

a tax attorney at Oracle at the height of his career after his life-long depression resurfaced.  After

graduating law school and working for a number of years, in 2018 he started to feel lethargic, without

energy or motivation.  He thought he might have a testosterone imbalance and began replacement

therapy.  But it did not work.  He fell deeper into depression and began to self-isolate, quitting his job

and withdrawing from family and friends.  He stayed up late at night and developed an addiction to

the internet:  political news, gaming and pornography.  This addiction led him to a dark place where

he discovered and downloaded large quantities of pornography, including child pornography.

Mr. Hartman presents as someone who came from a solid, stable middle-class upbringing, but

his life was more complicated than that.  Mr. Hartman was the youngest of four boys.  He was more

than a decade younger than his older brothers, and his three brothers had a different biological father. *See* Confidential Report of Psychological Evaluation, Jeremy Coles, Ph.D. (August 2020) ["Coles Report"] at 4.[9]  Mr. Hartman's biological father was a Vietnam veteran.  His father's emotional and physical health were impacted by the war, and he became an alcoholic.  PSR ¶¶ 73-74.

Mr. Hartman has vague memories of his biological father being abusive to his mother. Although Mr. Hartman's mother did not acknowledge the abuse in the PSR, Mr. Hartman's older brother Warren confirmed that she was abused by her then-husband, Mr. Hartman's father.  *Id.* ¶ 73. Mr. Hartman's mother recalled other difficulties with Mr. Hartman's father:  She had to bail him out of jail several times, and she confirmed that he suffered from a severe gambling addiction and alcoholism.  *Id.* ¶ 74.

Mr. Hartman was never particularly close with his biological father.  After his parents divorced, he spent a majority of his childhood with his mother, who he describes as volatile and "a lot to handle," but he would often spend months at a time alone with his alcoholic father in Colorado. Coles Report at 4; PSR ¶ 73.

As a young boy, Mr. Hartman suffered repeated sexual exploitation and abuse by caregivers. These were humiliating and confusing experiences.  Coles Report at 4.  A family member returned home early one day and almost found out about the abuse at the hands of a babysitter; this caused Mr. Hartman anxiety and fears that linger today whenever anyone comes to his home unannounced.  *Id.* Mr. Hartman internalized the abuse as his fault and suppressed this memory for most of his life.  He only confided in his mother after he was arrested for the instant offense.  PSR ¶ 75; Elaine Kay letter, Exh C.

---

[9]Dr. Coles' resume is Exhibit B to this sentencing memorandum.  Dr. Coles' Confidential Psychological Evaluation was filed separately and with an application and proposed order to file it under seal.

Mr. Hartman managed to overcome these difficulties by ignoring his emotions.  Coles Report at 4.  But this unprocessed trauma is now relevant to his recovery from life-long depression.  Only recently Mr. Hartman has come to understand how this untreated depression affected his entire life, including his decision to leave his employment at Oracle, his relationships with friends and family, and his physical and mental health.

Mr. Hartman's depression began in middle school.  He could not recall what caused this depression; he only knew he felt that way.  Coles Report at 6.  He entered individual therapy for about a year.  Then in his early 20's, Mr. Hartman received psychiatric treatment and was prescribed Prozac, an anti-depressant.  *Id*.  Mr. Hartman's mother recalls it was the first time she remembered his depression causing him to become reclusive.  He was in college and living off campus.  The property owner called Ms. Kay threatening to evict her sono.  Mr. Hartman was in his apartment with the curtains drawn.  He looked "like hell"; his home and car were a mess, and it was clear he had left the apartment only to get groceries.  Exh C.  Mr. Hartman's mother helped him to get counseling and medication for depression.  *Id.*

At another point in early adulthood, Mr. Hartman was living in Arizona and began to self-isolate from his loved ones.  His mother became worried when she did not hear from him for weeks, and she sent his brother, Scott, to check on him.  *Id*.  Scott flew in from Seattle and reported to his mom that Mr. Hartman was "in bad shape."  *Id*.  Scott found him in his "two-room apartment, filled knee high with pizza boxes, Coke cans, and cigarette butts. No alcohol or drugs; just severe depression that kept him from leaving the house for weeks or possibly months."  Scott Lathe letter, Exh. D.  Scott struggled with his own depression, and his experience enabled him to better understand his brother's "much more severe clinical depression," which the two have discussed many times throughout the years.  *Id*.

After Scott rescued him, Mr. Hartman went back in treatment and agreed to go back on

Prozac. *Id.*; *see also* Coles Report at 6. He got the help he needed to pull out of the dark place in which he found himself. But he stopped taking the drug after a year because he did not like the way it was affecting his thought process. Mr. Hartman took Prozac again later in his 30's after another serious "depressive bout." Coles Report at 6.

Despite these severe depressive episodes and a mostly absent and alcoholic father, Mr. Hartman managed to have a productive life. Mr. Hartman attended Chapman University for over four years but did not graduate. *Id*. at 5. He then worked selling cars for a number of years. He was not satisfied with this career and found a law school in San Jose that would allow him to attend without his undergraduate degree. *Id*. Mr. Hartman worked during the day and earned his law degree at night. He did incredibly well at law school and was first in his class. Bill Kay letter, attached as Exh. E; PSR ¶ 9. He passed the bar exam but was not sworn in as an attorney. *Id*. He was worried his prior misdemeanor convictions from college would be an impediment to being a licensed attorney. But he did not need his law license. He obtained a coveted job at Oracle working on tax law issues, and he was soon promoted to a management position. Coles Report at 5. That promotion was stressful and unsatisfying. Mr. Hartman was working 65 hours a week; he felt overwhelmed, lethargic, and removed from others. *Id*. To address these feelings, Mr. Hartman sought out hormone replacement therapy, thinking it would be a magic pill to address what was in fact a much more serious illness. PSR ¶ 85; Coles Report at 2, 8, 19. He found an online company that prescribed it for him. The hormone therapy caused more issues than it helped. It increased his libido at a time when he was not in a relationship, which led to his watching excessive amounts of pornography. Coles Report at 19 (citing research demonstrating that testosterone leads to increased libido).

In the year before his arrest for this offense, Mr. Hartman was in "bad shape mentally." Exh. E. He reported experiencing suicidal ideation. *Id*. at 6. On a couple of occasions, he entertained

ideas as to how he might kill himself.  *Id*.  Mr. Hartman's step-father, Bill Kay, in his letter to the

Court, provides insight into how Mr. Hartman's 2019 depression looked from the outside.  Exh. E.

Mr. Kay helped clean out his step-son's home after his arrest for this offense.  It took days.  "Trash

covered his floors and you would not have wanted to use any of the fixtures in the bathroom."  Mr.

Hartman's brother Warren described the home as "horribly filthy," in "disarray and disrepair."

Warren Lathe letter, Exh. F.  It was so bad that Warren refused to enter the bathroom.  *Id*.  To Mr.

Kay, his step-son's "home at the time of the arrest showed he was in a deep depression and . . . in a

lot of mental pain."  Exh. E.

   Mr. Kay verifies that this was not the first time Mr. Hartman's family had seen him in a "deep

depression with his dwelling in bad shape."  The last time was in his late 30's.  But he pulled out of it

and had a highly productive streak:  "he was married . . . earned a law degree at Lincoln Law School

in San Jose and graduated as valedictorian of his class.  Following that he had five years of success

working at Oracle."  *Id.*  Mr. Hartman left this Oracle job with an "offer to return" because he told his

family he wanted to start his own consulting business.  But looking back, Mr. Kay believes this

isolation eventually led to this most recent "downward spiral."  *Id.*

   Dr. Coles, who evaluated Mr. Hartman for this case, agrees with Mr. Kay's assessment:

> At the time of the controlling offense, multiple factors coalesced and led
> to Mr. Hartman's breakdown in judgment and simultaneous indulgence of
> pornography, some of which was child pornography. Specifically, he had
> quit his job and ended a relationship.  He did the former to reduce stress
> but, instead, this led to social isolation and a further dive into Internet
> activity.  Also at this time, he began testosterone therapy that led to hyper
> sexuality and, in turn, his Internet activity was dominated by endless hours
> watching pornography. . . . Somewhere in this cycle, he came across child
> pornography and began to download that form of pornography with all of
> the adult pornography that he was also downloading.

Coles Report at 19.  Dr. Coles explains that "contextualizing his behavior at the time of the

controlling offense is not an attempt to rationalize the behavior but to lend some understanding

regarding the situational stressors that led to a lapse in his judgment."  *Id.*

   Mr. Hartman's depression has been verified by his family and by Dr. Coles, who assessed him

using a depression-screening tool. *Id*. at 12. The assessment confirmed that "Mr. Hartman's clinical profile is marked by a significant elevation on the DEP scale." *Id.* Mr. Hartman's reports are consistent with a "significant depressive experience." He has a history of "experiencing life with moderate feelings of sadness and loss of interest or pleasure in normal activities. His depressive episodes are marked by sleep difficulties, sleep pattern, a decrease in level of energy and/or sexual interest, and a loss of appetite and/or weight." *Id.* These depressive episodes, which he has suffered throughout his life, led to "social isolation and an over-reliance on Internet activity to distract himself from his emotional life." *Id*. at 19. This activity "vacillated between gaming, pornography and discussion groups," and it had an addictive component. *Id.*

Importantly, Mr. Hartman is incredibly remorseful for his conduct in this case. He recognizes the appalling nature of the images that he viewed. He is ashamed of himself:

> Part of coming to terms with my own guilt has been trying to understand what it must be like for those victims. Again, in a very real way, it is not just images being propagated, but their victimization being re-created over and over. I look at my own feelings and . . . understand that this must be a tiny fraction of what those victims feel when they think about their abuse being played and replayed all over the world, to eyes that they will never see and to people who could be the person standing next to them in line at the grocery store, or their classmates, or colleagues or the stranger offering them a smile on the street. After my arrest, I cringed at eye contact with strangers. I can't imagine what it is like for them, I can only regret that I helped create a world where they have to feel that.

Rick Hartman acceptance letter, Exh. A.

Mr. Hartman hopes to understand why he committed this offense and vows to make the necessary changes so that he does not ever reoffend. He has worked diligently over the last year to find tools he needs to address his depression and where that led him two years ago. According to Mr. Hartman's family, they were "devastated" by the nature of the charges. Exh. E. But Mr. Hartman expressed to them in clear terms that he has fully grasped the nature of his inappropriate conduct. His brother Warren emphasized in his letter that Mr. Hartman "has shown deep remorse to . . . our family and understands the gravity of the situation as he has expressed it sincerely . . . many times over the

last year." Exh. F. His mother described hours of talks over this last year where Mr. Hartman would break down sobbing while addressing his past and his actions in this case. Exh. C.

Mr. Hartman's step-father is proud of the work his step-son has done over the last year "to improve the foundations of his life both socially and spiritually." He has improved "in his openness," he has demonstrated "acceptance of what he has done," and he has taken concrete steps to better himself. Exh. E. As Mr. Hartman's brother, Scott, put it, he sees that Mr. Hartman is devastated by what he has done. Scott understands the "self-destructive" nature of depression. Exh. D. This does not "explain or forgive what [his brother] has done – nothing ever can." But Scott has chosen to continue to have a relationship with his brother because he knows the "rest of him." *Id.* Mr. Hartman "will be paying for his crime the rest of his life. And [Rick] is, and I believe always will be, working to compensate for his actions." *Id*.

Mr. Hartman's brother James reports that notwithstanding this offense, he still trusts Mr. Hartman with his children and grandchildren. James Lathe letter, Exh. G. Mr. Hartman was there to help support James after his divorce. Mr. Hartman was also there for James' daughter, Mr. Hartman's niece, who was ill for three months before she died. *Id.* Mr. Hartman provided more support for her "than any other family member." *Id*.

Mr. Hartman is fortunate to have the love and support of his family. He was released on bond with the assistance of his mother and step-father, who are elderly, and he has spent the last year during the pandemic helping them around the home. He also was there for his mother when she was hospitalized with a heart condition several months ago, and he has worked with her on her post-hospitalization rehabilitation. Exh. E. While on release, Mr. Hartman studied to become a personal trainer. He earned his certification, and this is a career he plans to pursue once he is released from custody for this offense. Exh. C.

In addition to his weekly counseling sessions and group therapy, Coles Report at 3, Mr. Hartman spent his time over these last 14 months learning meditative practices to help with his recovery. Exh. C; Richard Hartman letter re treatment, Exh. H. While in college, Mr. Hartman studied meditation with a Buddhist teacher as part of his pursuit of a philosophy degree. When he was in custody at San Mateo for this offense, a similar class was offered by the "Enneagram Prison Project ["the Project"]." It is a program approved by the State of California as a way to combat recidivism. Exh. H. Mr. Hartman located a description of their work for his letter to the Court. *Id*. The Project provides a map for the incarcerated "to see and understand the thought processes, emotional drives, and behaviors that drove them to incarceration. With the guidance of [the Project, the incarcerated] can begin to make different choices, transforming the often unconscious drives that contributed to their incarceration and ongoing struggles." *Id*.

Mr. Hartman immersed himself in the class and in the work. When he was released from San Mateo, he reconnected with a former Buddhist teacher from his past, attending retreats and deepening his meditative work, and he contacted the Project's teachers at the San Mateo jail for more help. *Id*. He turned in a homework assignment he did not get to finish because he had been released, and his teachers connected him with a weekly out-patient group. *Id*. The conversations there have been honest, blunt, and more "in-depth" than any therapy offered to him in the past. *Id*. Most importantly, Mr. Hartman got himself back on Prozac to address the chemical imbalance triggering his depression. This time he vows to deal with any side effects of the medication. *Id*.

The consequences of this offense have led Mr. Hartman to find some peace in his life. As he concluded in his letter discussing his year-long work to rehabilitate himself: "It is wrong to say that being arrested for the charges I was arrested for is a good thing . . . [but it is] right to say that I would not have found this help, would not have found some of the internal freedom I am now finding, without that arrest. While it may sound trite . . . I can honestly say that for finding these things I am

actually grateful." *Id*.

**B.     The Nature and Circumstances of the Offense**

At the time of the offense conduct, Mr. Hartman was "depressed, anxious and socially isolated." Coles Report at 10. He was working 65 hours a week as a tax attorney and felt overwhelmed with his work. *Id*. His relationship ended and he felt alone and began to isolate himself. Mr. Hartman quit his job because he could not handle the stress. This made things worse because it caused him to be even more isolated and alone. He was in a "vicious circle of stress, social isolation and depression." *Id*. at 11. As described above, since middle school Mr. Hartman experienced intense periods of depression, and these dark periods continued into adulthood.

Sometime before leaving his job in 2018, Mr. Hartman began testosterone replacement therapy, which led to a severe increase in his libido. He sought out this therapy in part to ward off feelings of "low energy and depression." *Id*. After he stopped taking this medication in May 2019, his energy levels dropped and he stopped viewing as much pornography. In fact, he stopped downloading pornography in the summer of 2019, shortly before his September 2019 arrest for the instant offense. *Id*. After his pornography viewing waned, he spent more time with on-line gaming. *Id*. at 11-12.

Mr. Hartman was using excessive internet activity as a "maladaptive defense in his efforts to ward off dysphoria," feelings of unease and a general dissatisfaction with life. His internet behavior took many forms: political discussion groups, gaming and pornography. *Id*. at 11. He phased in and out of one of these three activities, often staying up through the night. His behavior would worsen when he was depressed, and he felt his online activity was addictive in nature. *Id.*

Mr. Hartman did not view all of the pornography that he downloaded. He would often download whatever was on a particular site without regard to what it contained. *Id*. at 9. He believes he was first introduced to child pornography from a pop-up ad that contained non-nude images of children. *Id*. at 11. From there he viewed it out of curiosity. It was not sexualized at first because he

was already spending hours looking at adult pornography, due mostly to his increased testosterone and higher libido. *Id*. Mr. Hartman admitted to Dr. Coles that he viewed and used some of the child pornography that he had downloaded with other materials. But he mostly viewed and masturbated to adult pornography. *Id*. at 8.

Mr. Hartman had a very large collection of adult pornography. The San Mateo Sheriff's report wrongly characterized Mr. Hartman's collection of pornography as being all child pornography. It was not. Coles Report at 10. A careful review by federal investigators confirmed that out of more than 162,000 images and videos of pornography on Mr. Hartman's devices, there were 759 videos and 8,435 images of child photography – approximately 18 percent of what he had downloaded. *Id*.

Mr. Hartman downloaded and viewed child pornography over a relatively short period, and he has never been aware of being sexually attracted to children. He also noted that he felt feelings of self-hatred and shame when he would view this content. *Id*. at 8-9. Mr. Hartman never thought of meeting up with a child for sexual contact, which is supported by the fact that no indication of such attempts were found after a thorough search of all of his devices. *Id*. at 9. Mr. Hartman also viewed images of transgender pornography, but he did not have sexual attraction to transsexuals in his everyday life. *Id*. According to Dr. Coles, "[c]linically, it is important to distinguish between fantasies and real life intentions, particularly with the advent of the internet in which access to sexual images of all kinds is readily available." *Id*. at 14.

Mr. Hartman has no history of sexual deviancy. He never engaged in exhibitionism, masturbating in public, streaking, voyeurism, bestiality, bondage, or sadomasochism. *Id*. at 8. Other than sexual encounters with peers as a teenager, he has had relationships only with adult women. He was in a long-term marriage and had several long-term adult female partners. *Id*. at 18. His behavior at the time of the controlling offense was "part of a larger internet addiction, part of which involved a pornography addiction." *Id*. at 12.

Moreover, Mr. Hartman has expressed genuine remorse regarding his behavior. During his

therapy and meditation sessions, he got in touch with his feelings of shame and remorse. He also

expressed to Dr. Coles a "sincere understanding of how child pornography victims are harmed." *Id*.

Importantly, Dr. Coles, who has extensive experience in the evaluation and treatment of sex

offenders, made two critical findings in this case. First, he opined that Mr. Hartman is not a

pedophile; second, he opined that Mr. Hartman is not a danger to children and is at the lowest risk to

re-offend. *Id*. at 14, 19. These opinions are based on his review of the discovery, years of experience

in the field, psychological testing of Mr. Hartman, and on his research.

To Dr. Coles, the offense conduct does not support the diagnosis of Pedophilic Disorder:

> Beyond this brief foray into child pornography, there is no evidence present that might otherwise support the idea that [Mr. Hartman] has experienced intense and recurrent, sexual fantasies, urges or behaviors related to prepubescent children. Notably, he has never been detected of a hands-on sex crime against a child. Additionally, there is no evidence in all of the computer material seized that he was attempting to contact a child in a chat room or in any other way. Additionally, a review of his relationship history reveals the fact that he has always engaged in fairly long-term relationships with adults -- his sexual activity and interest is best characterized as adult heterosexual. *Finally, Mr. Hartman indicated that he has never been aware of sexual desires related to children and this is supported by his MSI-II protocol.* He does acknowledge masturbating to some of the child images but his account of this activity suggests it is better understood within an addictive pattern that was not, first and foremost, being guided by an underlying deviant sexual arousal pattern. *In summary, it is my opinion that Mr. Hartman does not meet the diagnostic criteria for Pedophilic Disorder.*

*Id*. at 14 (emphasis added).

In addition, Dr. Coles determined that "all available data reveals Mr. Hartman to be at very low

risk for committing another child pornography offense, and an even lower risk for committing a

hands-on sex offense." He is not a sexually deviant man. *Id*. at 19. He has "used sexual activity

[masturbation] to help cope with his dysphoria but this has never, until the time of the controlling

offense, involved children." Indeed, Mr. Hartman's behavior at the time of the offense "was aberrant

and not indicative of pervasive underlying deviant trends in his sexual or behavioral functioning." *Id*.

As a result, Dr. Coles recommends that the Court impose a sentence of community supervision with individual and group counseling to help Mr. Hartman continue to explore his behavior during the controlling offense. *Id.*

Consistent with Dr. Coles' findings in this case, the Ninth Circuit has recognized a growing body of empirical research that casts serious doubts on the assumption that all persons viewing child pornography are equally dangerous and likely to commit serious offenses involving sexual contact. *United States v. Collins*, 684 F.3d 873, 890-91 (9th Cir. 2012); *Apodaca*, 641 F.3d at 1083; *R.V.*, 157 F. Supp. 3d at 237-41 (citing to numerous studies, research and reports concluding that although child molesters may possess child pornography, child pornography possessors are not likely to engage in contact offenses). In his concurrence in *Apodaca*, Judge Fletcher provided a detailed and thoughtful review of the current empirical evidence regarding the risks that defendants who possess child pornography will commit contact sex offenses with children. 641 F.3d at 1086 (Fletcher, J., concurring). Those risks are low. *Id.* (summarizing current empirical literature and studies that cast serious doubt on the existence of a substantial relationship between the consumption of child pornography and the likelihood of a contact sexual offense against a child). For all these reasons, the Court should consider this case law, research, literature, and Dr. Coles' low-risk assessment of Mr. Hartman in weighing the nature of the offense conduct.

### C. The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law and to Provide Just Punishment

A sentence of one year and one day with a lengthy period of supervised release meets the remaining goals of sentencing. It is a lengthy term that will promote respect for the law and provide a just punishment for the offense conduct. A year in custody with the chance to earn good time credits is a significant sentence for a defendant who has never served a prison sentence and who has only two misdemeanor priors from his college days that do not score.

Moreover, a long term of supervised release is more suited to address the offense conduct than requiring a defendant like Mr. Hartman to spend five years in custody. The probation office has

1   services available to treat and address the needs of a defendant in a case such as this one.  It can and

2   does require sex offender therapy and group therapy, as well as conditions of release that include

3   computer monitoring and internet restrictions.  Our probation office is excellent at supervising

4   defendants in cases like these, and it has systems in place to help ensure that a defendant does not

5   reoffend and re-possess internet pornography of any kind.  Moreover, as his model behavior on pre-

6   trial release suggests, Mr. Hartman already has received the message that he cannot re-offend.

7   According to Dr. Coles, who conducted a full risk assessment, Mr. Hartman poses a very low risk of

8   recidivism.  Coles Report at 15-19.

9       If one considers personal deterrence, Mr. Hartman does not need more than one year in prison

10  to punish him for his conduct.  An important collateral consequence of this conviction is the dramatic

11  effect it will have on Mr. Hartman's future.  Because of his offense, he will be required to register as

12  a sex offender and will labeled as such and monitored for life.  To be convicted of a federal child

13  pornography crime entails automatic lifetime continuous punishment:  "being marked as a pariah

14  with severe restrictions on residence, movements, activities and associations." *R.V.*, 157 F. Supp. 3d

15  at 210.  Adding "unnecessary" and "unduly long" periods of incarceration to such a sanction is

16  "inappropriate and it should be avoided." *Id.*

17      Mr. Hartman has lost friends, the trust and respect of his family, his professional reputation,

18  and his ability to practice in his profession.  He is concerned he will be unable to find a life partner

19  given the stigma associated with his crime.  He is a convicted felon, and there will be restrictions on

20  where he can live and what he can do for the rest of his life.  For example, he will be unable to go

21  certain places that might put him into unsupervised contact with minors, and he will be unable to live

22  within a certain distance from parks and schools.  These restrictions alone are a heavy burden to place

23  on defendants who struggle to find housing after release from custody.

24      Nonetheless, the government and probation office focus on retribution and general deterrence.

25  Indeed, much of the PSR is devoted to the impact the possession of child pornography has had on the

26  victims in this case.  PSR ¶¶ 19-45.  The victims here have recounted how they are re-traumatized by

27  their abusers each time an image is downloaded and viewed.  *Id.*  Mr. Hartman acknowledges this re-

28  traumatization and genuinely feels for the pain that his actions have caused the victims, and he wishes

he could make amends to them.  Exh. A.  Before sentencing, Mr. Hartman agreed to restitution instead of arguing over damages or causation, which he openly accepts as a small token of his remorse to the victims for his actions here.  Restitution Stipulation, ECF No. 41.

But Mr. Hartman's actions did not create the problem of internet pornography, and it is unlikely that a sentence of more than a year in prison will deter others from discovering these images online or engaging in similar activities.  The unfortunate truth is that unless and until technology companies do more to scrub these materials from their sites, these possession, receipt, and distribution crimes will continue.  Michael Keller and Gabriel Dance, *Child Abusers Run Rampant as Tech Companies Look the Other Way*, NEW YORK TIMES (Nov. 9, 2019) ("The companies have the technical tools to stop the recirculation of abuse imagery by matching newly detected images against databases of the material. Yet the industry does not take full advantage of the tools.").  This is true regardless of the sentence imposed in this case.

Finally, retribution is not a just reason here for imposing the kind of prison sentence suggested by the probation office.  Rather, in light of all of the factors addressed above and the events leading up to the commission of this offense, this is an appropriate case for a downward variance.  The tragedy here is that Mr. Hartman went down a rabbit hole of depression and became addicted to internet gaming, politics, and pornography.  To escape from depression, he turned to this content and on-line illegal pornography, rather than drugs.  There is no doubt that drug addiction affects families and children and has had incredibly detrimental effects on the community as well.  But, understandably, there is less of a stigma associated with depression-related addiction to drugs and alcohol.  Had his criminal conduct derived from drug addiction, Mr. Hartman likely would be eligible for ATIP, deferred sentencing, or other programs that would allow him to obtain the kind of therapy and counseling necessary to help him overcome his addiction.  But here, those programs are not available.  Nevertheless, Mr. Hartman's depression is an illness that needs treatment, and with the continued intensive therapy that he has engaged in over the last year, he is not likely to ever spiral back into the dark internet places where he found himself in the throes of his depression.

### D.    The Need to Avoid Unwanted Sentencing Disparities

Turning to the need to avoid disparity among similarly situated federal defendants, countless defendants over the years have been sentenced to terms of imprisonment significantly lower than those suggested by the advisory Guidelines.  Last year, for example, more than two-thirds of all sentences were below the guidelines range.[10]  As thoroughly documented by Senior Judge Weinstein, there is a strong "judge-initiated trend" of varying below the advisory Guidelines for non-production child pornography offenses.  *R.V.*, 157 F. Supp. 3d at 262.  In varying from the Guidelines, "district judges nationwide have spoken out against the harsh Guidelines sentences for child pornography offenders."  *Id.* (listing myriad cases throughout the country between 2008 and 2012 in which district courts have imposed substantial variances).  More importantly, Senior Judge Weinstein also noted that, for simple possession cases like this one, many courts have elected to impose minimal or non-custodial sentences:  "Courts have noted the comparatively lower culpability of defendants convicted of possessing child pornography . . . ."  *Id.* at 264-65.

At the conclusion of his treatise-like sentencing order, Senior Judge Weinstein imposed a non-custodial sentence for his defendant who – like Mr. Hartman – faced a Guidelines range of 78 to 97 months.  *Id.* at 212.  The defendant there, a devoted father and husband, downloaded child pornography in the privacy of his home for a year.  Unlike here, he also engaged in video chats with minor females (although he never had any inappropriate or sexual contact with a minor).  *Id.*  As Judge Weinstein noted, federal district judges are beginning to recognize "the varying degrees of culpability" for child pornography offenders and are imposing minimal sentences for low-end possessors.  *R.V.*, 157 F. Supp. 3d at 210, 262.

There are countless examples of courts across the country declining to impose sentences within the range recommended by § 2G2.2, *see, e.g.*, *United States v. Grober*, 624 F.3d 592 (3rd Cir. 2010) (sentencing range of 235 to 293 months; court imposed mandatory minimum sentence of 60 months); *United States v. Abraham*, No. 12-CR-384, 2013 WL 2099795 (D. Neb. May 15, 2013) (sentencing range of 210 to 240 months; court imposed sentence of 72 months), and many examples of courts

---

[10] *2020 Sourcebook of Federal Sentencing Statistics*, UNITED STATES SENTENCING COMMISSION, Table 32 ("Sentence Imposed Relative to the Guideline Range by Primary Sentencing Guideline").

1    imposing sentences of probation or custodial terms of two years or less.  *See, e.g., Apodaca*, 641 F.3d

2    1077 (sentencing range of 78 to 97 months; court imposed 24-month sentence) and *United States v.*

3    *D.M.*, No. 12-CR-170, 2013 WL 1846543 (E.D.N.Y. May 3, 2013) (sentencing range of 78 to 97

4    months; court imposed sentence of probation).

5         In fact, lower terms of custody are common in child pornography possession cases,

6    notwithstanding lengthy advisory sentencing ranges.  A former substitute teacher and Boy Scout

7    leader who possessed over 2,000 images of child pornography was sentenced to 15 months in

8    custody.  *United States v. Darrel James Dwight*, 15-CR-05430-BHS (W.D. Wash. Aug. 22, 2016).  A

9    defendant who possessed 7,400 images and 3,000 videos was sentenced to time served.  *United States*

10   *v. Peter Ferrell*, 15-CR-00331-CBA (E.D.N.Y. Mar. 8, 2016).  A defendant who collected hundreds

11   of thousands of images for nearly two years was sentenced to probation.  *United States v. Coleman*

12   *Chung*, 16-CR-00033-WMC (W.D. Wis. Sept. 1, 2016).  And a defendant, a computer consultant

13   who was skilled in preventing hacking attacks and had consulted with the FBI, who possessed more

14   than 600 images of child pornography, was sentenced to credit for time served (two days).  *United*

15   *States v. Brian Haller*, 15-CR-00242-RJB (W.D. Wash. Apr. 8, 2016).[11]

16        This trend exists in our judicial district as well.  Counsel has identified many recent cases, most

17   from the last few years, involving similar facts and Guidelines ranges, where defendants in the

18   Northern District of California have received no more than 24 months in custody.  These are

19   important examples for the Court to consider here:

20        • *United States v. Nicholas Banducci*, 18-CR-531 SI (imposing one-year-and-one-day

21

---

22   [11]*See also United States v. Autery*, 555 F.3d 864, 867 (9th Cir. 2009) (five years of probation); *United States v. Stall*, 581 F.3d 276, 277-78 (6th Cir. 2009) (one day of incarceration followed by ten-year

23   term of supervised release); *United States v. Prisel*, 316 F. App'x 377, 378 (6th Cir. 2008) (one-day custody followed by eighteen months of home confinement); *United States v. Rowan*, 530 F.3d 379,

24   380 (5th Cir. 2008) (five years of probation); *United States v. Polito*, 215 F. App'x 354, 355 (5th Cir. 2007) (per curiam) (five years of probation and one year of home detention); *United States v. Crespo-*

25   *Rios*, No. 08-CR-208, 2015 WL 6394256, *1 (D.P.R., Oct. 19, 2015) (time-served sentence and lengthy term of supervised release); *United States v. Mallatt*, No. 13-CR-3005, 2013 WL 6196946, at

26   *13 (D. Neb. Nov. 27, 2013) (time-served sentence followed by six years of supervision); *United States v. Diaz*, 720 F. Supp. 2d 1039, 1048 (E.D. Wis. 2010) (six-months custody and twelve years of

27   supervised release); *United States v. Meillier*, 650 F. Supp. 2d 887, 887 (D. Minn. 2009) (one day in custody with lengthy supervised release term); *United States v. Boyden*, No. 06-CR-20243, 2007 WL

28   1725402, at *10 (E.D. Mich. June 14, 2007) (one day in custody and one-year community confinement).

1    sentence for a defendant with the same sentencing range here: 78 to 97 months;

2    defendant used peer-to-peer file sharing and possessed thousands of images);

3    • *United States v. Michael Connell*, 18-CR-281 RS (imposing one-year-and-one-day

4      sentence for a defendant, an attorney, who possessed child pornography; district court

5      granted compassionate release before defendant completed his sentence due to the

6      COVID-19 pandemic; probation office recommended higher offense level for sadistic

7      and masochistic images but the parties did not include this enhancement in the plea

8      agreement, resulting in a range of 51 to 63 months);

9    • *United States v. Kelvin Chen*, 20-CR-84 EMC (imposing probation sentence, with six

10     months halfway house and six months home detention for young defendant who

11     possessed thousands of images and belonged to website with a VIP section where he

12     paid for access to child pornography; without an enhancement for sadistic/masochistic

13     images, the sentencing range was 51 to 63 months);

14   • *United States v. Ayala Cesar*, 20 CR-58 SI (imposing 24-month sentence for defendant

15     who used a messenger program to obtain thousands of images of child pornography,

16     notwithstanding a 60-month government and probation office recommendation;

17     defendant had the same offense level as here, 78 to 97 months).

18   • *United States v. Jeremy Harris*, 18 CR-243 EMC (imposing 21-month sentence for

19     defendant with over 5,000 images; sentencing range of 78 to 97 months (as here), and

20     probation office recommendation of 78 months);

21   • *United States v. Christian Lancaster*, 16-CR 313 YGR (imposing 20-month sentence

22     for defendant, a public school teacher, who faced a range of 57 to 71 months in

23     custody);

24   • *United States v. Tri Minh Dao*, 13-CR-00580 RMW (imposing five years of probation

25     for defendant who used peer-to-peer file sharing; range was 97 to 121 months).

26       To avoid unnecessary disparities, the Court should consider these cases to impose a one-year-

27   and-one-day sentence.  Cases throughout the country and in this district have resulted in similarly

28   measured sentences of probation, time served or brief custodial terms.  These cases often involve

similar conduct and, many times, an identical advisory sentencing range.

## CONCLUSION

Mr. Hartman is a pro-social individual in Category I criminal history who is at an exceptionally low risk to reoffend. He is working hard to address the issues that led him to access the offending images, and he has a supportive and loving family. His offense conduct stemmed from untreated severe depression, and he currently is engaged in therapy. Mr. Hartman is making excellent progress in treatment, and the Court has the power to give him the opportunity, after a one-year-and-one-day sentence, to rehabilitate himself with a continued mental health interventions.

As the concurrence in *Henderson* makes clear, the sentence imposed in this case should leave room for more serious offenses on the spectrum of child pornography-related crimes. 649 F.3d at 964-65 (Berzon, J., concurring); *see also R.V.*, 157 F. Supp. 3d at 210-11. The sentencing recommendation provided by the probation office in this case – and the range prescribed by the advisory Guidelines – fails to fully "distinguish among the varying degrees of culpability" for child pornography offenders. Failure to take these degrees of culpability into account "is particularly grave in the field of child pornography offenses." *R.V.*, 157 F. Supp. 3d at 210. Moreover, to be found guilty of a federal child pornography crime requires sex offender registration and its automatic lifetime continuous punishment. *Id.* Adding "unduly long" periods of incarceration to such a sanction "should be avoided." *Id.*

The government and the probation office recommend a long period of incarceration for this defendant. This is not usual, but the ultimate decision here rests with the Court. Mr. Hartman respectfully requests that the Court consider all of the information above to impose no more than a one-year-and-one-day sentence, followed by five years of supervised release, which will provide treatment and intensive monitoring of Mr. Hartman for six more years. This sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.

Dated:     May 11, 2021                          Respectfully submitted,

                                                 GEOFFREY A. HANSEN
                                                 Acting Federal Public Defender
                                                 Northern District of California

                                                          /S/
                                                 ANGELA M. HANSEN
                                                 Assistant Federal Public Defender